**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | **Chapter 7** |
| **Andrew Thomas Capponi,** | : | |
| **Debtor.** | : | **Case No. 11-17727 (JKF)** |

_____

| | | |
|---|---|---|
| **Roberta A. DeAngelis** | : | |
| **United States Trustee,** | | |
| **Plaintiff,** | : | |
| **v.** | : | |
| **Andrew Thomas Capponi,** | : | |
| **Defendant.** | : | **Adversary No. 12-0595** |

_____

# <u>MEMORANDUM  OPINION</u>

BY:   Jean K. FitzSimon
        United States Bankruptcy Judge

## I.  INTRODUCTION

Before the Court is the motion of the plaintiff, Roberta A. DeAngelis, the United

States Trustee ("UST"), for summary judgment on her Complaint Objecting to Debtor's

Discharge Under Section 727.  The UST moves for summary judgment pursuant to 11

U.S.C. § 727(a)(3).[1]   The UST supports her motion for summary judgment ("Motion")

_____

[1]  The UST also moves for a denial of discharge under 11 U.S.C. § 727(a)(5).
Since the Court concludes that the Debtor must be denied a discharge under
subsection (a)(3), it is unnecessary to analyze the Motion under subsection (a)(5).

with the transcript ("Transcript"), dated August 20, 2012, of the Chapter 7 Trustee's

continued 11 U.S.C. § 341 meeting of creditors which was coupled with a 2004

examination of the Debtor.[2]  As support for his opposition to the Motion, the Debtor

relies upon: (i) his Schedules and Statement of Financial Affairs ("SOFA"); (ii) the

Transcript;[3] (iii) an affidavit of his own; and (iv) an affidavit by his attorney, David B.

Smith, Esquire. Upon consideration of the record on summary judgment, the Court shall

grant summary judgment in favor of the UST and deny the Debtor a discharge pursuant

to 11 U.S.C. § 727(a)(3).  There is no genuine dispute as to any issue of material fact

and the UST is entitled to judgment as a matter of law.

## II.  BACKGROUND

The Debtor has been in the construction business since he was twenty years old.

Affidavit of Andrew Capponi ("Debtor Aff.") ¶ 4.  During this period, he acquired and

invested in real estate and real estate-related projects.  Id. ¶ 5. Sometimes, he was

financially successful; other times, he was not.  Id. ¶ 6.

For estate planning purposes, the Debtor created an irrevocable trust for his son

and an irrevocable trust for his wife.  Id. ¶ 41.  One of the trusts was created in 1998;

the other one was created in 2003.  Id. ¶ 41.  These trusts ("Trusts") eventually

---

[2]  The continued § 341 meeting of creditors, conducted by Bonnie Finkel, Esquire, on behalf of the Chapter 7 Trustee, was immediately followed by the 2004 exam of the Debtor, conducted by George Conway, Esquire, of the UST's office. The continued § 341 meeting and the 2004 exam shall be hereinafter collectively referred to as "§ 341 meeting/2004 exam."

[3] Since the UST relies on the Transcript in support of her Motion, see Motion ¶ 6, and the Debtor relies on it in opposition to the Motion, see Debtor's Response in Opposition to Plaintiff's Motion for Summary Judgment Denying Debtor Discharge ("Response") ¶ 1, the Court has reviewed the Transcript in detail in ruling on the Motion.

2

acquired commercial rental properties in Bensalem, Pennsylvania.  Id. ¶ 42.  The details of this acquisition will be explained below.  Significantly, the Debtor contends that he is neither a trustee nor a beneficiary of the Trusts.  See Response ¶ 8(d).

In 2005, the Debtor was "sustaining mounting losses from unprofitable construction projects and he was not able to address" some of his liabilities as they became due.  Id. ¶ 8.  As a consequence, lawsuits were filed against him and/or the entities with which he was associated.  Id. The Debtor opted not to defend many of the lawsuits because: (i) he acknowledged that he owed the money at issue; and (ii) anticipated an increase in his earnings which would enable him to address the liabilities and judgments.  Id. ¶ 9.

Subsequently, some of the Debtor's judgment creditors escalated their efforts to collect against him.  Id. ¶ 10. In some instances, the creditors levied or attached some of the Debtor's assets.  Id.  The Debtor concluded that he could no longer own a business because the payment stream from his self-employment could be attached and his business would otherwise be at risk.  Id. ¶ 12.  As a result, the Debtor "explored the possibility of being employed by a third party but creating a compensation structure that would enable [him] to reap the economic benefits of work that [he] originated."  Id. ¶ 13.

In or around 2009, the Debtor accepted a position as "estimator/project manager" with a company known as 4-Winds Construction Services, LLC ("Four Winds").  Id. ¶ 14. According to the Debtor, he reached an "oral understanding" with Brian Taylor who was the sole member/owner of Four Winds that the Debtor "would be compensated on a job by job basis based upon the level of profitability from jobs" that

3

the Debtor "brought to Four Winds." Id. ¶ 15.  Despite being asked, the Debtor never

disclosed the specific percentage of profits to which he was entitled from Four Winds.[4]

Transcript ("Tr.") at 53-54; 108.  He specifically denied that he agreed to a 65/35 split in

favor of Four Winds and that a written agreement existed regarding the division of

---

[4]  In the following colloquy, the Debtor admitted that there was split of profits between Four Winds and himself but sidestepped the Chapter 7 Trustee's question regarding the agreed upon split of profits between them:

| | |
|---|---|
| Trustee: | I'm not limiting it just to whether you had an ownership interest.  For example, 4 Winds you were clearly very involved in that – |
| Debtor: | Yes. |
| Trustee: | – that entity – |
| Debtor: | Correct. |
| Trustee: | – but Brian Taylor was the head of it, the quote, unquote, owner, but I think your testimony was that you divided up the income from that. |
| Debtor: | That's correct. |
| Trustee: | Right?  And did we ever establish what that ratio was?   How much – |
| Debtor: | It would be negative whatever. |
| Trustee: | – percentage?  Well, negative meaning the cost of the project was more than what you received? |
| Debtor: | Basically, nobody paid him. |

Tr. at 53-54.

4

profits. Tr. at 108;[5] Debtor's Aff. ¶ 15.  In his affidavit, the Debtor asserts that "most of

the jobs performed by Four Winds were not profitable" and, therefore, he was "paid very

little of what [he] otherwise would have earned" if the jobs had been profitable.  Id.

During the § 341 meeting/2004 exam, the Debtor testified that he received some money

from working for Four Winds but, in the next breath, he contradicted himself by stating

that he never made any money.  The aforementioned testimony is set forth in the

following colloquy from the § 341 meeting/2004 exam:

> Trustee:    Do you remember the last time you received any
>             money as a result of a 4 Winds job?
>
> Debtor:     No.
>
> Trustee:    No?

---

[5]  The UST asked the Debtor whether there was a written agreement regarding
the split of profits and about whether a 63/35 split sounded familiar, stating:

> UST:        Did you ever have a written agreement with Brian
>             Taylor as to the division of profits –
>
> Debtor:     Never.
>
> UST:        - - at 4 Winds?
>
> Debtor:     No.
>
> UST:        If I told you that Mr. Taylor testified that it was
>             65/35, would that ring a bell with you?
>
> Debtor:     No.
>
> UST:        So, you never signed such an agreement?
>
> Debtor:     No.

Tr. at 108.

| | |
|---|---|
| Debtor: | That one I definitely don't remember, no. |
| Trustee: | So, you didn't keep track, but you did receive some money as a result of various 4 Winds - - |
| Debtor: | I did - - |
| Trustee: | - - construction jobs? |
| Debtor: | - - yes.  Correct. |
| Trustee: | So, how would you keep track of whether – if what you got was appropriate vis-a-vis what Brian got.  Like, you know, you said you're very good with numbers.[6] |
| Debtor: | It was very easy; we never were in the plus. |
| Trustee: | You were never in the plus? |
| Debtor: | Never. |
| Trustee: | You never made any money? |
| Debtor: | Never. |

Tr. at 48-49.  During his 2004 exam, the Debtor also testified that he believed that he

received a W-2 in 2010 from Four Winds, see Tr. at 99; however, in his affidavit, the

Debtor states that he did not.  See Debtor's Aff. ¶ 37.

---

[6]  During the continued § 341 meeting, the Debtor testified that he contacts his accountant who lives in Florida by calling his office.  When asked whether he had his accountant's phone number, the Debtor recited it from memory.  Immediately thereafter, the following colloquy ensued:

| | |
|---|---|
| Trustee: | You must have a good relationship if you've memorized his number.  I-800 call John Lynn? |
| Debtor: | No, *I'm very good with numbers.* |

Tr. at 46 (emphasis added).

6

Several times during the continued § 341 meeting/2004 exam, the Debtor

testified that, while Taylor owned Four Winds, he did not run the company; rather, the

Debtor was the one who ran the company.  The following colloquy provides an example

of such testimony:

| | |
|---|---|
| Trustee: | . . . So, what was the settlement of a lawsuit about with U.S. Construction? |
| Debtor: | The job that they didn't pay Brian on. |
| Trustee: | I'm sorry; I couldn't hear you. |
| Debtor: | A job that they did not pay Brian on; that they did not pay him for. |
| Trustee: | Oh, what kind of job was it? |
| Debtor: | Excavation. |
| Trustee: | So, 4 Winds was supposed to do the excavation? |
| Debtor: | They did and U.S. didn't want to pay them. |
| Trustee: | They did do the excavation? |
| Debtor: | Yes, they did. |
| Trustee: | Were you involved in the negotiation at all of the settlement? |
| Debtor: | A little bit, yes. |
| Trustee: | Why? |
| Debtor: | Because I was the one working there. |
| Trustee: | Is it your testimony that you, I mean, did you run that business at all, 4 Winds? |
| Debtor: | Pretty much, yes. |

7

Trustee:       <u>You did run it?</u>

Debtor:        <u>Yes.</u>

Trustee:       <u>But you had no ownership interest?</u>

Debtor:        <u>None.</u>

Trustee:       Okay.  You had an understanding with Brian
               Taylor –

Debtor:        Pretty much.

Trustee:       – how to run it?

Debtor:        Yes, uh-huh.

Tr. at 47 (emphasis added).  At another point during the § 341 meeting/2004 exam, the

Debtor testified that it was part of his job to keep track of the construction costs on Four

Wind's jobs.  This testimony occurred during the following colloquy:

Trustee:       Okay.  And did anybody keep track of the, you
               know, the construction costs of the job?
               Somebody has to, you know, somebody has to
               keep track of what's coming in and what's
               going out.

Debtor:        It's in my head.

Trustee:       So, you would do that?

Debtor:        Yes, I would.

Trustee:       Was that part of your job?

Debtor:        Yes, it was.

                              * * *

Trustee:       Is there any paperwork - -

Debtor:        Not really.

| Trustee: | - - for any of these construction jobs? |
|---|---|
| Debtor: | No. |
| Trustee: | No? |
| Debtor: | (Witness shakes his head in the negative.) |

Tr. at 58-59.   In an about-face to this testimony that he ran Four Winds and that it was part of his job to keep track of the construction costs incurred by the company, the Debtor asserts, in his response to the Motion, that he "was simply an employee of '4 Winds' and had no responsibility for record keeping or maintenance thereof."  Debtor's Response ¶ 6.

In or about December of 2009, the Debtor became aware of an opportunity to purchase commercial rental properties located on Camer Drive in Bensalem, Pennsylvania (the "Camer Properties").  According to the Debtor, he "allowed" the Trusts, which were mentioned above – of which the Debtor asserts he is neither a trustee nor beneficiary, to acquire a 51% interest in the Camer Properties.[7]  Aff. ¶ 42; Tr. at 54-55, 91.  The remaining 49% interest in the two commercial buildings was purchased by Brian Taylor, the owner of Four Winds.  Debtor Aff. ¶ 42.  The Trusts and Taylor apparently owned the Camer Properties by way of an entity called Jolie Holdings ("Jolie").  Jolie purchased the Camer Properties from their owner, Ron Bershad, for $1,050,000.  Tr. at 54-55, 91.  The purchase involved a deposit of $100,000 and a mortgage loan from Bershad to Jolie.  Id. at 91.  The UST questioned the Debtor

---

[7] Since, according to the Debtor, he has no involvement with the Trusts as a trustee or a beneficiary, his statement in his affidavit that he "created both trusts .... and then _allowed_ them to acquire the aforementioned 51% interest in the Jolie property," is Debtor's Aff. ¶ 42 (emphasis added), seems misplaced.

9

regarding the $100,000 deposit as follows:

Trustee: And what was the source of those funds?

Debtor: 4 Winds a/k/a my mother lent it to us.

Trustee: Well, who did she lend it to, 4 Winds or you or someone else or Jolie?

Debtor: Well, when we bought the property, Brian Taylor was a partner.

Trustee: Okay.

Debtor: And he's not any longer.

Trustee: Okay. But your mom handed someone $100,000?

Debtor: Yes.

Trustee: Who was it payable to?

Debtor: It was basically 4 Winds.

Trustee: To 4 Winds?

Debtor: 4 Winds wrote the check, I believe, yes.

Trustee: And did 4 Winds hold an ownership interest in Jolie Holdings?

Debtor: No.

Trustee: At that point? Okay. So, $100,000 went into 4 Winds and then who were the owners of Jolie?

Debtor: Brian Taylor was 49 percent and the two trusts were 51 percent.

Trustee: Okay. But all hundred thousand dollars from your mother was the initial amount of the purchase price plus the seller's mortgage; is that correct?

| Debtor: | That's correct. |
|---|---|
| Trustee: | So, why is it that the trust had 51 percent and Taylor had 49 percent when 100 percent of the deposit monies came from your mother? |
| Debtor: | Because 4 Winds was supposed to rent most of the building.   They were like the anchor tenant.  So, they carried, you know, they were supposed to pay most - - they were, like, making the deal; that's why. |
| Trustee: | Okay. |
| Debtor: | In other words, without them we had no reason to buy really.  It was basically for their office. |
| Trustee: | And what happened? |
| Debtor: | So, I said, why don't we do it and you can pay the trust rent and my mother will put up the money and it looked like a good deal at the time. |

Tr. at 91-93.

Shortly after Jolie purchased the Camer Properties, a fire occurred there, causing "about a million dollars" in damages.  Tr. at 56-57.  Bershad, who formerly owned the properties and who holds the mortgage on them, collected the insurance proceeds for the damage.  Id. at 57.  According to the Debtor, most of the insurance proceeds were used to repair the damage which the fire caused but Bershad still retains some of the proceeds in an escrow account.  Id.

The company which was hired to repair the fire damage was Four Winds.  Tr. at 57.  When asked to describe the work for which Four Winds was hired, the Debtor testified: "Tear it down, rebuild the offices, you know, put walls up, put a new roof, put new steel."  Id. at 58.  The Chapter 7 Trustee asked the Debtor more questions regarding the project, stating as follows:

Trustee:      How much was the construction project?

Debtor:       About a million three, five, in that area.

Trustee:      A little bit more than the insurance that came in?

Debtor:       Yes.

Trustee:      And was 4 Winds paid for the construction project?

Debtor:       Not totally, no.

Trustee:      How much were they paid for it?

Debtor:       $800,000.

* * *

Trustee:      So, is it your testimony that neither you nor your wife received any income or money as a result of payments, as a result of this construction on Jolie?

Debtor:       That?  No.  We were in the hole about $300,000.

Trustee:      Well, how would you afford that if your not - - you're not accounting to me that you have any income, so how would you possibly afford that?

Debtor:       I work and I'm not getting paid.  All my work and blood and sweat is not - - I didn't receive anything for it.  So, instead of getting paid, you know, it's in the building.

Trustee:      Do you have any ownership interest in the building?

Debtor:       No.

12

Trustee:      You personally?

Debtor:       (Witness shakes head in the negative.)

Trustee:      But Jolie has it?

Debtor:       Yes.

Trustee:      Did the value of Jolie go up as a result of this construction?

Debtor:       Yes.

Tr. at  58-60 (emphasis added).  The Chapter 7 Trustee subsequently asked the Debtor whether Jolie owed him any money. This questioning evolved into a series of questions about Four Wind's project for Jolie and the amount which Four Winds was paid for it. This colloquy consisted of the following:

Trustee:      Is there any other entity that owes you money? What about Jolie?

Debtor:       No.

Trustee:      Jolie doesn't owe you anything?

Debtor:       No, it's a gift for my son and my wife.

Trustee:      A gift from your son?

Debtor:       For my son and my wife; my work is a gift.

Trustee:      Oh, your work was a gift?

Debtor:       Yes.

Trustee:      So, what work did you do that was a gift?

Debtor:       What work didn't I do?

Trustee:      Well, just tell me what you did.

13

Debtor:        Everything.

Trustee:       All your work - - are you talking about 4 Winds['] work or your personal work?

Debtor:        My personal work.

Trustee:       So, your personal work meaning your construction work?

Debtor:        Yes.

Trustee:       For Jolie?

Debtor:        Yes.

Trustee:       Was a gift?  What do you think the value of that gift is?

Debtor:        I have no idea.  Ten billion.

Trustee:       Well, what did you do for Jolie?

Debtor:        What didn't I do?  I did everything.

Trustee:       Just tell me - -

Debtor:        You keep asking me the same thing.

Trustee:       I mean, just give me a run-down of the kinds of work you did for Jolie.

Debtor:        I did everything.  I did the concrete.  I did everything.

Trustee:       You did the concrete; okay.  We are getting some specifics here.  What else?

Debtor:        I mean, other than building the structural and the extra work I did, I mean, I don't know, you know, from the steel to concrete, the studs, the - - everything.

Trustee:       So, you built the building?

14

| | |
|---|---|
| Debtor: | (Witness nods in the affirmative.) |
| Trustee: | Just you? |
| Debtor: | <u>No</u>.  Well, I - - the work got done with 4 Winds, but the extra $300,000 in work roughly that is done I did.</u> |
| Trustee: | Okay.  And when did you do all that? |
| Debtor: | I don't remember.  When didn't I do all that? Nights, days, weekends. |

<u>Id</u>. at 76-78 (emphasis added).   Based on this colloquy, Four Winds was paid in the entirety for the $800,000 of work which it put into the Camer Properties.  The Debtor personally donated an extra $300,000 worth of his own work to Jolie because the Trusts were part owners of the entity and the Debtor considered his work to be a gift to his wife and son.

At the close of the § 341 meeting, a creditor's attorney, Drew Salaman, Esquire, posed some questions to the Debtor about the amount, if any, which Four Winds owes to him; the Chapter 7 Trustee also interposed a few questions of her own.  Salaman started the colloquy as follows:

| | |
|---|---|
| Salaman: | <u>The sums that you are owed by 4 Winds, would you say it would be in excess of $100,000?</u> |
| Debtor: | <u>I would have no idea</u>. |
| Salaman: | Would it be less than $5,000? |
| Debtor: | I have no idea. |
| Salaman: | They could owe you nothing at all? |
| Debtor: | Pretty much, no. |

Salaman:    Because they don't owe you anything unless they get paid?

Debtor:    Pretty much.

Salaman:    If they did get - - if they were paid in full, how much would they owe you?

Debtor:    It's hard to guess.  I'd just be purely guessing and putting it out there, which is . . .

Salaman:    Well, what was your salary supposed to be?

Debtor:    It really wasn't ever established.

Salaman:    You did use the word salary today, didn't you?

Debtor:    I did.  I believe I did, yes.

Salaman:    What did you mean by that?

Debtor:    I meant by - - paid expenses, whatever.  I forget. Whatever payee used to get; I forget.

Salaman:    <u>Are you owed expenses by 4 Winds</u>?

Debtor:    <u>Yes</u>.

Salaman:    <u>But you don't know how much that is either</u>?

Debtor:    <u>No idea</u>.

Trustee:    If I - -

Debtor:    Water under the bridge.

Trustee:    If I asked you to establish how much they owed you, would you be able to sit down and give me an estimate?

Debtor:    No.

Trustee:    Not this second.

Debtor:    No.

16

| | |
|---|---|
| Trustee: | No? |
| Debtor: | No. |

* * *

| | |
|---|---|
| Salaman: | <u>Have you ever asked Brian Taylor personally to compensate you for your labor done for 4 Winds</u>? |
| Debtor: | Did I or could I? |
| Salaman: | Did you? |
| Debtor: | No. |
| Salaman: | <u>Could you</u>? |
| Trustee: | <u>Or for your expenses</u>? |
| Debtor: | <u>Could I?  Yes</u>. |

* * *

| | |
|---|---|
| Salaman: | Is there a reason that you didn't ask him? |
| Debtor: | Because I felt bad because I knew that he didn't get paid.[8] |

Tr. at 76-78 (emphasis added).

The Debtor testified that he left Four Winds because he never made any money working for it.  Tr. at 49.   Apparently, as part and parcel of the Debtor leaving Four Winds, Brian Taylor transferred his 49% interest in Jolie to the Trusts and the Debtor's mother made a $10,000 payment to Taylor.  As the following colloquy reveals, these three events (the Debtor leaving Four Winds, Taylor transferring his 49% interest in

---

[8]  When questioned by the Chapter 7 Trustee, the Debtor identified the following entities/jobs for which Four Winds was not paid or was only partially paid for its work: (i) Central Bucks East High School; (ii) U.S. Construction; and (iii) "a job down the shore."  Tr. at 72-73.

Jolie to the Trusts and the Debtor's mother paying $10,000 to Taylor) were somehow intertwined:

| | | |
|---|---|---|
| Trustee: | What happened to the 49 percent of Mr. Taylor's interest in the property? |
| Debtor: | He basically gave it up <u>as part of me leaving and separating ways and things like that.</u> |
| Trustee: | So, he just gave it to you? |
| Debtor: | <u>Well, basically - - because he didn't go through on his deal it was basically, you know, and my mom did put up the money it was really just the right thing to give it back</u>. |
| Trustee: | Okay. |
| Debtor: | <u>You understand what I mean because he never really became the anchor</u> – |
| Trustee: | Let me stop you right there.  Who did he give it to?  Who did he give his interest to? |
| Debtor: | The trusts. |
| Trustee: | Did he receive anything for it? |
| Debtor: | I believe $10,000. |
| Trustee: | What was the source of the $10,000? |
| Debtor: | My mother. |

Tr. at 93-94 (emphasis added).  The Debtor's testimony does not explain how or why these three events were connected.  However, neither the Trustee nor the UST asked the Debtor to fill in that gap.

After leaving Four Winds, the Debtor accepted a job working as an equipment operator for Mega Construction Company ("Mega") which is a Pennsylvania corporation

owned by the Debtor's cousin, John Capponi.  Debtor Aff. ¶ 16.  In the latter part of

2011, it became clear to the Debtor that he did not have sufficient income to pay his

expenses as they became due, not to mention the judgments which he owed, so he

decided to file for bankruptcy.  Debtor Aff. ¶¶ 18-19.  At this time, the Debtor was still

working for Mega.

On October 3, 2011, the Debtor filed his Chapter 7 bankruptcy case.  Docket

Entry No. 1.  At the time, Debtor's tax returns for 2010 had not yet been filed.  See

Debtor's Schedule B, Docket Entry No. 31.

On November 4, 2011, the Debtor filed his SOFA.  Docket Entry No. 31.  In

response to Item No. 1 on Debtor's SOFA, which required the Debtor to list his gross

income for 2009, 2010 and 2011,[9] he listed $33,000 in gross income from wages for

2009 and $27,057.60 in gross income from wages for 2011, but for 2010, he stated:

"[I]nformation on 2010 income is not available; SOFA will be amended once this

amount is computed."  Docket Entry No. 31.  Similarly, the Debtor responded to Item

No. 2 on the SOFA by stating that, for 2010, "profits and losses have not yet been

finalized by Debtor's accountant; accordingly, they are listed at $0, but will be amended

upon completion of calculations and 2010 return."  Id.

Item No. 9 on the SOFA required the Debtor to list the dates on which payments

were made to his attorney by him or on his behalf and the amount of the payments.  In

response to this item, the Debtor listed five payments, totaling $13,000.  Id.

Significantly, one of the payments is for $8,000.  This payment was not made by the

---

[9]  The Debtor was required to state the income which he earned in 2011 from
January 1 of that year until he filed for bankruptcy.

Debtor; it was made by Mega on July 7, 2011.  Yet, in his affidavit, the Debtor states

that his W-2 income from Mega in 2011 was $41,381.  Debtor's Aff. ¶ 38. The Debtor's

weekly salary at Mega was $1,591.60.  Tr. at 89.  Twenty-six weeks multiplied by

$1,591.60 equals exactly $41,381.  Consequently, the $8,000 payment which Mega

made paid to the Debtor's attorney was *in addition* to the $41,381 in income which the

Debtor earned from the company in 2011.  Absent the disclosure of Mega's $8,000

payment in response to Item No. 2 on the Debtor's SOFA, there is no oral or written

evidence of this payment in the record.

On November 17, 2011, the Chapter 7 Trustee commenced the § 341 meeting of

creditors.  However, she continued the meeting because she requested additional

documentation from the Debtor.

The Debtor continued working for Mega until approximately June or July of 2012,

when the company "laid everyone off."  Tr. at 8-9.  At or about the time the lay-off

occurred, the Debtor purchased a company called "Site Work Solutions" from "a

gentleman named Jorge Lopez" and started working for himself.[10]  Id. at 5.

On August 20, 2012, the §341 meeting/2004 exam was held.  As of that date,

the Debtor's tax returns for 2010 and 2011 still had not been prepared or filed.  When

the Chapter 7 Trustee asked the Debtor, during his continued § 341 meeting, why he

had not yet filed his 2010 tax returns, the Debtor responded: "Other priorities."  See Tr.

at 18.  When questioned further, the Debtor testified that the tax returns were not in the

works.  Id.  The Debtor also acknowledged that his 2011 tax return had not been filed.

Id. at 19.

---

[10]  According to the Debtor, he paid $1.00 to Lopez for: (i) the company; (ii) "a
bunch of debt"; and (iii) a "2000 Freightliner dump truck."  Transcript at 5-6.

During his continued § 341 meeting, the Chapter 7 Trustee asked the Debtor to explain the total absence of activity, for approximately twelve months, on his monthly bank statements for his sole bank account. Tr. at 29. The Debtor answered that he does not use a bank account, and that when someone gives him a check, he cashes it at the bank upon which the check is drawn.[11]  Tr. at 29-30.  According to the Debtor, he stopped depositing his earnings into his bank account in 2010, before he filed for bankruptcy, because he was afraid the earnings would be garnished.  Debtor's Aff. ¶¶ 10, 36.

According to the Debtor, neither he nor his wife kept track of checks or money which they had coming into their household.[12]  Tr. at 31.  The Chapter 13 Trustee asked

---

[11]  The Debtor testified that while he had been using check cashing services, he discontinued doing so because they are "too expensive." Tr. at 30.

[12]  This line of questioning by the Chapter 13 Trustee went as follows:

| Trustee: | Do you keep a log of checks you receive? |
|---|---|
| Debtor: | Not usually. |
| Trustee: | So, how do you know how much money you have coming in? |
| Debtor: | I don't. |
| Trustee: | Your wife was listed as the bookkeeper for 4 Winds [on the Debtor's Schedule I].  Does she have some sort of bookkeeping background? |
| Debtor: | Not really, no. |
| Trustee: | No? |
| Debtor: | (The witness shakes head in the negative). |

(continued...)

the following questions related to the issue of the Debtor's record-keeping habits:

| | |
|---|---|
| Trustee: | Have you provided documents to Mr. Lynn, your accountant, in the past for when he would prepare tax returns? |
| Debtor: | Yes. |
| Trustee: | And you would keep bookkeeping, normal accounting? |
| Debtor: | Normally, yes. |
| Trustee: | Okay.  And was that stopped?  You stopped keeping track of - - |
| Debtor: | Yes. |
| Trustee: | Why? |
| Debtor: | Just too - - it was impossible for me to tell someone everything I did during the course of the day, what was spent, I got home too late, working too much, just struggling, never enough money there, couldn't afford a bookkeeper, couldn't keep money in the bank, couldn't do any of it. |

Tr. at 62.

---

[12](...continued)

| | |
|---|---|
| Trustee: | All right.  So, does your wife keep track of checks that come in? |
| Debtor: | No. |
| Trustee: | The two of you have no idea of how much money you have coming into your household – |
| Debtor: | No. |
| Trustee: | - - for your income? |
| Debtor: | Not really; it's day by day. |

Tr. at 31.

During the 2004 examination on August 20, 2012, the UST also asked the

Debtor about his 2011 tax return and the existence of records for his income and

expenses in 2011.  This line of questioning follows:

UST:    Did you file a 2011 tax return, personal tax return?

Debtor:    I did not.

UST:    What records do you have to demonstrate your income and expenses for 2011?

Debtor:    Just the paychecks I've received and house bills.

UST:    Okay.  Did you receive any other money besides your paychecks?

Debtor:    No.

UST:    In 2011 you received no other monies?

Debtor:    No, other than the 45,000 that I told you about.

UST:    Okay.  How about expenses beyond the house bills?

Debtor:    What about them?

UST:    Do you have any other expenses beyond the house bills?

Debtor:    I mean, some, yes, sure.

UST:    Do you have records for those?

Debtor:    Not really.

UST:    Why not?

Debtor:    No time.  I'm working 15 hours a day.  How can I save every receipt?  It's almost impossible; I'm too tired.

23

| UST: | How do you pay the house bills? |
|---|---|
| Debtor: | Go to an agency, go to Verizon, go to what's-a-name and pay them. |
| UST: | Why don't you use a checking account? |
| Debtor: | No time; just too far behind the eight ball. |

Tr. at 97-98.

The UST also asked the Debtor whether he or any entity in which he had an ownership interest purchased any of the equipment of Four Winds. The Debtor answered that, in or about March of 2012, he purchased "a paver, a bobcat and a bulldozer" from Four Winds for $50,000.  Tr. at 101-102.  The Debtor testified that he paid Brian Taylor, the owner of Four Winds, $25,000 and still owed him the remaining balance ($25,000) of the purchase price.  The UST then asked the Debtor the following questions about the $25,000 which he paid to Taylor:

| UST: | Do you have any records of what you paid him and when? |
|---|---|
| Debtor: | Do I?  No. |
| UST: | No? |
| Debtor: | No. |
| UST: | Do you have any receipts from him? |
| Debtor: | No. |
| UST: | What was the source of the funds? |
| Debtor: | The source of funds were from - - from work; work that I've been doing. |
| UST: | Work you've been doing?  Okay.  Since January to now what work have you been doing?  How much money have you earned? |

24

Debtor:        I don't know.  I have to - - I don't know.

UST:           You don't know?

Debtor:        I don't know.

UST:           Do you have any records?

Debtor:        No.

UST:            - - to tell what was earned?

Debtor:        No.

UST:           Will you get a 1099 or a W-2?

Debtor:        Will I?

UST:           Yes.

Debtor:        Probably a 1099, yes.

UST:           From who?

Debtor:        No, not a 1099, no, I won't.

UST:           Okay.  Do you keep a journal as to what
               money came in?
Debtor:        No.

UST:           Do you keep a journal as to your expenses?

Debtor:        No.

UST:           Do you know what your expenses were in the
               last eight months?

Debtor:        No.

Tr. at 102-103.

The UST also asked the Debtor about the records which he maintained within

the two year period before he filed for bankruptcy.  The UST questioned the Debtor as

follows:

| | | |
|---|---|---|
| UST: | Now, two years prior to bankruptcy, so I'm going back to 2010 and 2009, did you keep a journal as to all the expenses that you had? |
| Debtor: | No. |
| UST: | Did you keep a journal as to all the receipts or income that you have? |
| Debtor: | No. |
| UST: | What records did you keep? |
| Debtor: | Slim to none. |

Tr. at 99-103.

In September of 2012, the Debtor had his accountant, John Lynn, complete his 2010 and 2011 tax year returns and has been in possession of drafts of the tax returns since that time.  Debtor Aff. ¶ 31.  Nevertheless, to date, the Debtor has not filed an amended SOFA.

According to the averments in the Debtor's affidavit, his income in 2010 consisted of the following: (i) W-2 income of $6,400 from Jolie Holdings Realty Management, Inc.; and (ii) K-1 income of $21,233 for rental income from 6610 Hasbrook Partnership.[13] Debtor Aff. ¶ 37.  Notably, none of Debtor's income in 2010 was from Four Winds. In 2011, the Debtor avers that he received W-2 income of $41,381.00 from Mega and net income of $45,000 from a $67,500 payment which he

---

[13]  The Debtor also had K-1 losses of $9,478 from Due Amici Associates, L.P., and $96.00 from Due Amici Development, LLC.  Debtor Aff. ¶ 37.  Debtor has a limited interest in Due Amici Developments, LLC, and a limited partnership in Due Amici Development Associates, L.P., which owns property located at 2361-73 Welsh Road, Philadelphia, Pennsylvania.  Id. ¶ 43.  Due Amici Development, LLC, is the general partner of Due Amici Development Associates, LLP.  Id.

26

received for assisting with and/or brokering a sale of property between its owners and

an unrelated third party. Id. ¶¶ 38, 40.[14]  Importantly, the Debtor makes no mention in

his affidavit of the $8,000 payment which Mega made, in 2011, on his behalf to his

attorney.[15]

Since the Debtor apparently did not earn any income from Four Winds in 2010,

he must have earned income from the company in 2009 since his Affidavit discloses

that he was paid a "little" by Four Winds.  See Debtor's Aff. ¶ 15 ("[M]ost of the jobs

performed by Four Winds were not profitable and therefore I was paid very little of what

I otherwise would have earned if those jobs had been profitable.").  However, the

Debtor's 2009 tax return is not part of the record before the Court on summary

judgment.[16]

In direct contrast to the Debtor's testimony during the § 341 meeting/2004 exam

that he kept "slim to none" records of his income or expenses and did not use a bank

---

[14] The Debtor also avers that he had K-1 losses of $13,019 from Due Amici Development Associates, L.P.

[15]  In paragraph 44 of the Debtor's Affidavit, the Debtor mentions payments that were made to his counsel, but simply states that "the specific amounts and sources" of such payments" are accurately reflected on his "Statement of Financial Affairs 9." Debtor's Aff. ¶ 44.

[16]  During the § 341 meeting/2004 exam, the UST asked the Debtor to explain a non-passive loss of $103,546 on his 2009 tax return but the Debtor was unable to do so.  Tr. at 107.  In his Response, the Debtor insinuates that, although the UST had a copy of the 2009 tax return in his hand during his questioning, he failed to allow the Debtor to review it for help in explaining the passive loss.  See Response ¶ 8(o) ("[T]he Trustee had a copy of the Debtor's 2009 return in hand during the deposition, but did not provide it to the Debtor to review.").  However, the transcript reveals that the reason the UST did not hand the tax return over was because the Debtor had already indicated that he would be unable to read it.  See Tr. at 68, 107.

27

account because he had "no time," was "too tired" and was "just too far behind the eight ball," the Debtor avers in his affidavit that: (i) he did not keep a log of his income and expenses because his income from employment is reflected on the W-2's which he received and his income/loss from real estate investments is reflected on his form K-1's; and (ii) he stopped using a bank account because it would be "susceptible to being attached by judgment creditors." Id. Debtor's Aff. ¶¶ 10, 36. The Debtor offers no explanation whatsoever for stating an entirely different reason at the § 341 meeting/2004 exam from the reason which he gives in his affidavit for not keeping a record of his income and expenses.

### III. STANDARD FOR SUMMARY JUDGMENT

Under Rule 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. " Fed. R. Civ. P. 56(a).   "A fact is 'material' if it 'might affect the outcome of the suit under the governing law[.] A factual dispute is 'genuine' if the evidence would permit a reasonable jury to return a verdict for the nonmoving party." Brangman v. AstraZeneca, L.P., 952 F. Supp.2d 710, 720 (E.D. Pa 2013) (quoting  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. Catrett, 477 U.S. 317, 323 (1986).  "After the moving

28

party has met its initial burden, the adverse party's response 'must — by affidavits or as

otherwise provided in this rule — set out specific facts showing a genuine issue for

trial.'" Taggart v. Wells Fargo Home Mortgage, Inc., 2013 WL 3009730, at *2 (E.D. Pa.

June 18, 2013) (citing Fed. R. Civ. P. 56(e)(2)).  In deciding a motion for summary

judgment, the court must construe the facts and inferences in the "light most favorable

to the non-moving party." Toll Brothers, Inc. v. Century Surety Co., 2013 WL 3009721,

at *4 (E.D. Pa. June 17, 2013).  The court's role is not to weigh the evidence, but only

to decide "whether there is a disputed, material fact for determination at trial." Gray v.

Jackson (In re Jackson), 453 B.R. 789, 795 (Bankr. W.D. Pa. 2011).  "To defeat a

motion for summary judgment, a nonmoving party must show that there is more than

merely 'a scintilla of evidence,' supporting his position or 'some metaphysical doubt as

to the material facts.'" Spangler v. City of Philadelphia, 523 Fed. Appx. 142, 145 (3d

Cir.  2013) (citations omitted).  In Murray v. JELD-WEN, Inc., 2013 WL 126323 (M.D.

Pa. January 9, 2013), the district court observed:

> Our circuit has stated: ". . . summary judgment is essentially
> 'put up or shut up' time for the non-moving party; the
> non-moving party must rebut the motion with facts in the
> record and cannot rest solely on assertions made in the
> pleadings, legal memoranda, or oral argument."

Id. at *2 (quoting Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)).

## IV.  DISCUSSION OF APPLICABLE BANKRUPTCY LAW

Plaintiff seeks to have the Debtor denied a discharge under § 727(a)(3).

"Completely denying a debtor his discharge . . . is an extreme step" which "should not

be taken lightly." Rosen v. Bezner, 996 F.2d 1527, 1531 (3rd Cir. 1993). Consequently,

objections to discharge under § 727(a) are strictly construed against the creditor and

liberally construed in favor of the debtor. Panda Herbal International, Inc. v. Luby (In

re Luby), 438 B.R. 817, 826 (Bankr. E.D. Pa. 2010).

However, "a discharge in bankruptcy is a privilege — not a right — which must

be earned." Sonders v. Margolies-Mezvinsky (In re Morgolies-Mezvinsky), 265 B.R. 681,

690 (Bankr. E.D. Pa. 2001). "Upon filing for bankruptcy," a debtor is obligated "to be

forthright in providing financial information." Id. "[C]omplete financial disclosure [is] a

'condition precedent' to discharge." Id. (citations omitted).

Section 727(a)(3) provides:

> (a) The court shall grant the debtor a discharge, unless--
>
> * * *
>
> (3) the debtor has concealed, destroyed, mutilated,
> falsified, or failed to keep or preserve any recorded
> information, including books, documents, records, and
> papers, from which the debtor's financial condition or
> business transactions might be ascertained, unless such act
> or failure to act was justified under all of the circumstances
> of the case[.]

11 U.S.C. § 727(a)(3). The purpose of § 727(a)(3) is to insure that the debtor provides

the trustee and his creditors with sufficient information to "'ascertain the debtor's

financial condition and track his financial dealings with substantial completeness and

accuracy for a reasonable period past to present.'" In re Juzwiak, 89 F.3d 424, 427 (7th

Cir. 1996) (quoting Bay State Milling Company v. Martin (In re Martin), 141 B.R. 986,

30

995 (Bankr. N.D. Ill. 1992)). "It also ensures that 'creditors are supplied with

dependable information on which they can rely in tracing a debtor's financial history.'"

Holber v. Jacobs (In re Jacobs), 381 B.R. 147, 166 (Bankr. E.D. Pa. 2008) (quoting

Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992)).  See also DeAngelis v. Von

Kiel (In re Von Kiel), 461 B.R. 323, 336 (Bankr. E.D. Pa. 2012) (quoting Gray v. Jackson

(In re Jackson), 453 B.R. 789, 796 (Bankr. E.D. Pa. 2011)) ( " 'As a precondition to the

bankruptcy discharge, § 727(a)(3) requires a debtor to produce information for

creditors to determine and track the debtor's financial . . . transactions for a reasonable

time prior to bankruptcy.' ").  The court in Exner v. Schultz (In re Schultz), 71 B.R. 711

(Bankr. E.D. Pa. 1987), aptly expressed the purpose of § 727(a)(3), stating:

> Section 727(a)(3) is intended to allow creditors and/or
> the trustee to examine the debtor's financial condition and
> determine what has passed through a debtor's hands. The
> creditors are entitled to written evidence of the debtor's
> financial situation and past transactions.  Maintenance of
> such records is a prerequisite to granting a discharge in
> bankruptcy, unless the debtor justifies his failure to keep
> such records. The debtor's records need not be perfect, but
> must be kept in an "intelligent fashion."  In re Kottwitz, 42
> B.R. 566 (Bankr. W.D. Mo.1984).  Those records must at
> least reasonably allow for reconstruction of the debtor's
> financial condition to meet the requirements of the
> Bankruptcy Code.

Id. at 716 (citations omitted except for quotation).

In Meridian Bank v. Alten, 958 F.2d 1226 (3d Cir. 1992), the Third Circuit

addressed the record-keeping obligations of a debtor, noting that the Bankruptcy Code

does not require a debtor to maintain a bank account nor "an impeccable system of

bookkeeping."   Id. at 1230.   "Nevertheless," the Third Circuit observed, "the records

must ' "sufficiently identify the transactions [so] that intelligent inquiry can be made of

them.'" Id. at 1230 (citations omitted).   "A  debtor's records must be such that

'[c]reditors ... [are] not [ ] forced to undertake an independent investigation of a

debtor's affairs.' " In re Juzwiak, 89 F.3d 424, 429 (7th Cir. 1996) (quoting United States

v. Ellis, 50 F.3d 419, 424 (7th Cir. 1995) (citations omitted)); see also PNC Bank v.

Buzzelli (In re Buzzelli), 246 B.R. 75, 96–97 (Bankr. W.D. Pa. 2000) (quoting same

passage from  In re Juzwiak).

"The test is whether 'there [is] available written evidence made and preserved

from which the present financial condition of the bankrupt, and his business

transactions for a reasonable period in the past may be ascertained.' " In re Meridian

Bank, 958 F.2d 1226, 1230 (3d Cir. 1992) (quoting In re Decker, 595 F.2d 185, 187 (3d

Cir. 1979) (citations omitted)).   Oral testimony is not a substitute for written records.

In re Juzwiak, 89 F.3d 424, 429 (7th Cir. 1996).   In order to obtain the benefits of a

Chapter 7 discharge, a debtor has "a legal duty to maintain adequate records of his

income and expenses." In re Meridian Bank, 958 F.2d 1226, 1232 (3d Cir. 1992).

Bankruptcy courts have broad discretion "in determining whether a debtor's records are

sufficient under § 727(a)(3)." In re Jackson, 453 B.R. 789, 796 (Bankr. E.D. Pa. 2011).

The party objecting to discharge under § 727(a)(3) must show that: (1) the

debtor failed to maintain and preserve adequate records; and (2) the failure made it

impossible to ascertain the debtor's financial condition for a reasonable period past to

present.  See Roodhof v. Roodhof, 491 B.R. 679, 688 (Bankr. M.D. Pa. 2013) (citing

Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir.1992)).  Importantly, § 727(a)(3)

"does not require any showing of intent."  Jou v. Adalian (In re Adalian), 474 B.R. 150,

164 (Bankr. M.D. Pa. 2012); see also Wachovia Bank v. Spitko (In re Spitko), 357 B.R.

272, 305 (Bankr. E.D. Pa. 2006) (no intent to defraud is required under § 727(a)(3)).  It

is also important to note that § 727(a)(3)'s "disclosure requirement extends beyond the

property of the estate to include all 'business transactions' which shed light on the

financial condition of the debtor."  Wachovia Bank v. Spitko (In re Spitko), 357 B.R.

272, 307 (Bankr. E.D. Pa. 2006) (quoting Office of Comptroller General of Republic of

Bolivia on Behalf of Bolivian Air Force v. Tractman, 107 B.R. 24, 27 (S.D.N.Y. 1989)).

If the plaintiff proves both prongs of the aforementioned test by a

preponderance of the evidence, then the debtor must justify his/her failure to maintain

and preserve adequate records under the circumstances.  Haupt v. Belonzi (In re

Belonzi), 476 B.R. 899, 904 (Bankr. W.D. Pa. 2012).  "The plain language of section

727(a)(3) places the burden on the debtor to justify the lack of adequate record

keeping."  Meridian Bank v. Alten, 958 F.2d 1226, 1234 (3d Cir. 1992)

A determination of justification under § 727(a)(3) "requires the court to look at

all of the circumstances and evaluate everything on a 'case-by-case basis.'"  Eveland v.

Kishbaugh (In re Kishbaugh), 399 B.R. 419, 427 (Bankr. M.D. Pa. 2009) (quoting

Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir. 1992)).  "The basic standard is to

look at what a reasonable person would do in similar circumstances.  Such an inquiry

should take into account the sophistication, education, and experience of the debtor."

Eveland v. Kishbaugh (In re Kishbaugh), 399 B.R. 419, 427 (Bankr. M.D. Pa. 2009)

(citations omitted).  See also Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir.

1992) ("The issue of justification depends largely on what a normal, reasonable person

would do under similar circumstances.").

## V.  APPLICATION OF THE LAW TO THE FACTS

*Whether the Debtor maintained adequate records?*

Based on the Debtor's uncontradicted testimony, he did not maintain and,

consequently, does not have written records of: (i) his profit-sharing agreement with

Four Winds/Brian Taylor; (ii) the expenses for which Four Winds never paid him;[17]

(iii) income, paychecks, payments or other compensation (in whatever form) which he

and/or his spouse have received since 2009; and (iv) the expenses, beyond house bills,

which he and/or his wife have incurred since 2009.  Since all of this information was

personal to the Debtor and/or his wife, the Debtor obviously had the ability to maintain

written records of it.  Without such basic information, it is impossible for the Debtor's

creditors or the trustees to make heads or tails out of his financial history and condition.

Debtor's compensation or profit-sharing agreement with Four Winds is relevant

to ascertaining the Debtor's financial condition because, without knowledge of the terms

---

[17]  When the Debtor filed for bankruptcy, the Chapter 7 Trustee became the
person responsible for making the decision of whether to pursue Four Winds to recover
the expenses which it owed to the Debtor.  However, without any records regarding the
expenses, the Chapter 7 Trustee is unequipped to make an informed decision of
whether she would be entitled to and, if so, whether it would make sense financially, to
pursue such a recovery.

of the agreement, the Debtor's creditors and the Chapter 7 Trustee have no way of knowing whether and, if so, how much Four Winds owes or may owe to the Debtor in compensation.  Since the Debtor began working for Four Winds in 2009 and filed for bankruptcy in October of 2011, the Court concludes that questions about the Debtor's compensation or profit-sharing agreement with Four Winds are relevant to ascertaining the Debtor's financial condition "for a reasonable period past to present."

The amount which Four Winds owes the Debtor for expenses is also integral to ascertaining the Debtor's financial condition for a reasonable period from past to present.  Yet, the Debtor testified that he had "no idea" regarding the amount of such expenses.  Absent records containing this information, the creditors and trustees lack necessary information to ascertain the Debtor's financial condition.

The Debtor contends that it was unnecessary for him to keep records of his income because "all of my income is set forth in W-2's from my employers – i.e., Four Winds and Mega."  Debtor's Aff. ¶ 36.  However, the record discloses a transfer by Mega on the Debtor's behalf of $8,000 to his attorney.  The Debtor provides no documentation regarding this transfer and, but for the mention of the transfer on his SOFA, the payment was undisclosed.

Insofar as the Debtor's expenses, he specifically testified that he had expenses beyond his house bills and that he failed to keep any record of them.  Again, without a written record of such expenses, the Debtor's creditors and the trustees are handicapped in ascertaining the Debtor's financial condition "for a reasonable period past to present."

In sum, based on the record before the Court, the Debtor, by his admitted failure to maintain any written record of the agreement which he had with Four Winds, the

expenses which he is owed by Four Winds, the money coming into his household and

expenses beyond his ordinary household bills, made it impossible for his creditors and

the trustees to track his financial dealings and assess his financial condition.[18]  Since a

Chapter 7 debtor has a duty to maintain such records, the Debtor must justify his failure

to satisfy this duty or else he shall be denied a discharge.

*Whether the Debtor was justified in not maintaining records?*

As noted above, the Debtor explained at the § 341 meeting/2004 exam that he

kept slim, if any, records of his income because he was working too much, got home

too late and was too tired.  In his affidavit, the Debtor provides another reason for not

keeping records of his income.[19]  He states that he did not maintain records of his

---

[18]  Moreover, as of August of 2012, the Debtor had not filed his 2010 or 2011 federal tax returns.  In September of 2012, he finally "caused" his accountant to prepare drafts of these returns.  Debtor's Aff. ¶ 31.  However, there is no evidence in the record that the returns have been filed.  The failure to file personal tax returns, while most likely not a determining factor under § 727(a)(3), is a factor to be considered.  See Wachovia Bank v. Spitko (In re Spitko), 357 B.R. 272, 310 (Bankr. E.D. Pa. 2006).

[19]  When a non-movant seeks to defeat a motion for summary judgment by submitting an affidavit which contradicts his or her earlier deposition testimony, the court may disregard the affidavit pursuant to the "sham affidavit" doctrine.  Cellucci v. RBS Citizens, N.A., ___ F. Supp.2d ___, 2013 WL 6641290 at *2 n.2 (E.D. Pa. December 17, 2013) (citing Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007)).  This doctrine "is based upon the theory that an affidavit that contradicts an individual's early testimony 'indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.'"  Id.  The Third Circuit "uses a flexible version of the sham affidavit doctrine."  Cellucci, supra, 2013 WL 6641290 at *2 n.2 (quoting Jiminez, 503 F.3d at 254).  Under the flexible approach, courts generally should consider statements made in an affidavit, even though they are inconsistent with the affiant's earlier deposition testimony, when the statements are supported by independence evidence or a reasonable explanation is given for the inconsistency between the two.  Id.  However, when there is no explanation for the contradiction between the subsequent affidavit and
(continued...)

income because all of it is recorded on the W-2 forms issued by his employers, namely
Four Winds and Mega.  However, the Debtor's creditors and the trustees are entitled to
all relevant information which bears upon the Debtor's financial condition and not just
his income.  The Debtor's W-2 records may only provide part of the picture.

In his affidavit, the Debtor also explains that he did not use a bank account to
pay his bills because he was afraid that if he deposited his earnings into his bank
account, his creditors would garnish the funds. Debtor Aff. ¶ 10.  The Debtor never
mentioned this concern during the § 341 meeting/2004 exam.  In any event, while a
debtor is not required to maintain a bank account, he or she is still required to maintain
records of income and expenses.  The creditors and trustees are entitled to written
records which enable them to independently assess the Debtor's financial condition and
determine, for themselves, what passed through the Debtor's hands.

In paragraph 36 of his affidavit, the Debtor lists the methods which he used to
pay his bills.  Thereafter, he states: "While I did not keep a specific log of these

---

[19](...continued)
the prior deposition, courts should ignore the affidavit.  Id.  See also Carter v. Mullen,
2013 WL 5145189, at *10 (E.D. Pa. September 13, 2013) (court disregarded affidavit to
the extent it contradicted or was inconsistent with the non-movant's prior deposition
since he offered no explanation for the inconsistency between the two and failed to
point to "any corroborating evidence that would lend credence to his self-serving
statement.").  This rule "makes practical sense, as 'prior depositions are more reliable
than affidavits,' which 'are usually drafted by counsel, whose familiarity with summary
judgment procedure may render an affidavit less credible.'" Cellucci, supra, 2013 WL
6641290 at *2 n.2 (quoting Jiminez, 503 F.3d at 252).

In the instant case, it is unnecessary to apply the sham affidavit doctrine
because none of the Debtor's reasons, whether provided during the § 341
meeting/2004 exam or in his affidavit, justify the Debtor's failure to comply with the
record keeping obligations imposed on him by § 727(a)(3).

transactions, I am able to state that all of my income was used to pay my normal household expenses as well as some non-recurring necessities, such as legal fees." Debtor's Aff. ¶ 39.  Creditors and trustees are not obligated to accept a Debtor's words in place of records.  They are entitled to records which corroborate a debtor's statement regarding his financial affairs and enable them to verify the accuracy of it.

Lastly, the Debtor argues that he is justified in not having records regarding Four Winds because he stopped working for the company before he filed for bankruptcy. The Debtor is point-blank wrong.  Pursuant to § 727(a)(3), creditors and trustees are entitled to information which enables them to trace a debtor's financial affairs for a reasonable period past to present.  See Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992).  Since the Debtor worked for, and incurred expenses on behalf of, Four Winds from sometime in 2009 to sometime in 2010, his compensation or profit-sharing agreement with Four Winds as well as the expenses which he incurred for the company are indeed relevant in tracing his financial history and ascertaining his financial affairs.

The Debtor is not an unsophisticated debtor.  He graduated from high school, has been involved in the construction business for 20 years and, in his own words, has "acquired or invested in real estate and real estate-related projects," which were sometimes successful and sometimes not.  Debtor's Aff. ¶ 5.  He testified regarding several real-estate related deals during the § 341 meeting/2004 exam.  Based on the Debtor's level of sophistication and under the circumstances present in this case, he had an obligation to be forthcoming and specific regarding the profit-sharing or compensation agreement which he had with Four Winds.  Instead, the Debtor has been utterly vague and noncommital about the agreement.  Regardless of whether the Court

38

accepts the Debtor's testimony and statement that he did not have a written profit-sharing or compensation agreement with Taylor, the Court finds the lack of such an agreement unacceptable given the Debtor's utter failure to define the terms of the agreement.  Perhaps, the Debtor's agreement with Taylor or Four Winds was completely vague.  However, absent a specific agreement, the creditors and trustees have no means of ascertaining the Debtor's financial condition during the period leading up to, and on the date, when he filed for bankruptcy.

Moreover, the Debtor has made no attempt to justify his failure to maintain and keep records of the expenses which he is owed by Four Winds.  Even assuming that he failed to maintain such records because he was too tired or was working too hard, the Court is unpersuaded that these reasons justify his failure to maintain these relevant financial records.

## V.  SUMMARY

The Debtor is not entitled to a discharge under Chapter 7 of the Bankruptcy Code because he unjustifiably failed to maintain and keep records from which his financial condition might be ascertained.  Therefore, he shall be denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

An Order consistent with this Memorandum Opinion shall be issued.


DATED:  March 25, 2014.
_____
HONORABLE JEAN K. FITZSIMON
United States Bankruptcy Judge

Copies to:

**<u>Plaintiff's Counsel</u>**
George Conway, Esquire
Office of the U.S. Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

**<u>Defendant's Counsel</u>**
David B. Smith, Esquire
Smith Kane, LLC
112 Moores Road, Suite 300
Malvern, PA 19355